**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

ROBERT NAUMAN, Individually and On
Behalf of All Others Similarly Situated,
                                        Plaintiff,

                    v.

ARRAY BIOPHARMA INC., RON
SQUARER, DAVID HORIN, JASON
HADDOCK,
                        Defendants.

---

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL**
**SECURITIES LAWS**

---

Plaintiff Robert Nauman ("Plaintiff"), individually and on behalf of all other persons

similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the

following based upon personal knowledge as to himself and his own acts, and information and

belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through

his attorneys, which included, among other things, a review of the Defendants' public

documents, conference calls and announcements made by Defendants, United States Securities

and Exchange Commission ("SEC") filings, wire and press releases published by and regarding

Array Biopharma Inc. ("Array" or the "Company"), analysts' reports and advisories about the

Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity

for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Array securities between December 16, 2015, and March 17, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Array is a biopharmaceutical company focused on the discovery, development, and commercialization of targeted small molecule drugs to treat patients afflicted with cancer. The Company's lead cancer drug binimetinib (MEK162) was evaluated in multiple trials and combinations, including a Phase 3 "NEMO" study versus dacarbazine in unresectable or metastatic NRAS-mutant melanoma patients.

3.     Founded in 1998, the Company is headquartered in Boulder, Colorado, and its stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "ARRY."

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Array's NEMO study failed to show sufficient clinical benefit of the binimetinib NDA in use for patients with NRAS-mutant melanoma; (ii) the Company was aware that this lack of supporting clinical data would not be sufficient to receive U.S. Food and Drug Administration ("FDA") approval of binimetinib in use for patients with NRAS-mutant melanoma; and (iii) as a result of the foregoing, Array's public statements were materially false and misleading at all relevant times.

2

5.      On March 19, 2017, Array issued a press release announcing it had withdrawn from the FDA Division of Oncology Products 2 the new drug application ("NDA") for binimetinib monotherapy for the treatment of NRASmutant melanoma, a rare, mutationally-driven subset of skin cancer.

6.      On the following day, biotech analyst John Carroll from Endpoints News published an article entitled "Array walks back its FDA pitch on binimetinib, derailing plans for commercial launch." The article stated, in relevant part:

> **Array BioPharma has some explaining to do. Fifteen months after the Boulder, CO-based biotech said that it had the data needed for its first approval of binimetinib for NRAS-positive melanoma, execs are walking back the application and its plans for a launch.**
>
> In a statement out Sunday evening, Array $ARRY said that after getting feedback from the FDA, execs "concluded that the clinical benefit demonstrated in the Phase 3 NEMO clinical trial would not be found sufficient to support approval of the NRAS-mutant melanoma NDA."
>
> Shares of Array dropped 26% in pre-market trading Monday.
>
> Michael Schmidt at Leerink was not pleased. He noted:
>
> > While NRAS+ melanoma was only a small value driver for the company, **we think this comes as a surprise to investors and is a clear setback for the company and mgmt.'s regulatory and commercial strategy. Recall, management planned to build a commercial infrastructure and visibility with customers this year around the launch in NRAS+ melanoma, which would also be in preparation for the planned launch in 2018 of binimetinib/encorafenib in more competitive BRAF+ melanoma, which is ARRY's main value driver.**
>
> **It was a much different story back in late 2015 when CEO Ron Squarer said that their MEK blocker hit the primary endpoint on progression-free survival, with the drug arm registering 2.8 months compared to 1.5 months for a group on dacarbazine. It didn't look like much, but Array said it was plenty to take to the FDA.**
>
> In the summer of 2016, though, the biotech also conceded that the drug had not significantly improved overall survival.

3

Array has had plenty of ups and downs with the drug. Novartis had partnered with the company, but punted the program when they executed a big asset swap with GlaxoSmithKline. Pierre Fabry then took their spot, but Array held on to US commercial rights.

(Emphasis added.)

7.      On this news, Array's share price fell $1.43 or 13.54% over two trading days, to close at $9.13 on March 21, 2017.

8.      On May 10, 2017, during a conference call to discuss the Company's financial and operating results for the third fiscal quarter ended March 31, 2017 ("Q3 2017 Conference Call"), analyst Michael Schmidt from Leerink asked about the reasons of the withdrawal of the binimetinib NDA in use for patients with NRAS-mutant melanoma. Ultimately, while attempting to blur the truth, Array's CEO and Individual Defendant Squarer admitted that: (i) Array lacked sufficient data to support approval of the binimetinib NDA in use for patients with NRAS-mutant melanoma, (ii) as a result, Array was aware it would not be able to launch binimetinib in use for patients with NRAS-mutant melanoma. In relevant part:

**Michael Schmidt**

*And then I guess just a question going back to NRAS melanoma, just curious to the reasons why you put the NDA ahead of the outcome actually?*

**Ron Squarer**

Yes Michael, it's Ron. I think did what we could to explain the situation. We know that history, we feel we've always been transparent with the present cons of the data published and shared them and give and we always gave, we considered to be the appropriate attention meaning we never suggested that it was slam dunk and didn't also suggest it was key to our evaluation, it was a very small population which would have yielded very low revenues. The reason we did what we did which was everything that could be done to pursue potential approval over a long period of time, an extensive conversation with the FDA was in an attempt to make the product available to patients who have really so few choices, so after you progress in NRAS melanoma, therapy, you really have no reasonable choice available. *And so we believe that working with the FDA we would find a way but when it became clear that was not going to occur, we made the decision that*

4

*we made and clearly we and they need to be focused now regarding the Array portfolio on Columbus and then later BECON.*

**Michael Schmidt**

*But was it basically a function of the changing treatment paradigm in the context of those patients or was it related to the data itself?*

**Ron Squarer**

*Those two are tightly linked*, and so clearly the majority of our patients were in first line and in NRAS specifically IO is a clear first line therapy. And so then you're sure that is a component of the calculation. *Without months of deliberation and creative work to find a path forward, it's impossible to sort of explain it is leading to one thing.* The FDA has a job to do and they consider a lot of factors in doing it and the best we can do is present our best case and we feel we did that and that's all the insight I have on it.

(Emphasis added.)

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

12.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the acts and conduct complained of herein occurred in substantial part in this Judicial District.  Array's principal executive offices are located within this Judicial District.

13.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired Array securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Array is incorporated in Delaware, with principal executive offices located at 3200 Walnut Street, Boulder, Colorado 80301.  Array's shares trade on the NASDAQ under the ticker symbol "ARRY."

16.     Defendant Ron Squarer ("Squarer") has served as the Company's Chief Executive Officer ("CEO") and a member of the Array's Board of Directors at all relevant times.

17.     Defendant David Horin ("Horin") served as the Company's Chief Financial Officer ("CFO") from the beginning of the Class Period until July 2016.

18.     Defendant Jason Haddock ("Haddock") has served as the Company's CFO since July 2016.

19.     The Defendants referenced above in ¶¶ 16-18 are sometimes referred to herein as the "Individual Defendants."

20.     The Individual Defendants possessed the power and authority to control the contents of Array' SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity

6

to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Array is a biopharmaceutical company focused on the discovery, development, and commercialization of targeted small molecule drugs to treat patients afflicted with cancer.

22.     The Company's lead cancer drug binimetinib (MEK162) was evaluated in multiple trials and combinations, including a Phase 3 "NEMO" study versus dacarbazine in unresectable or metastatic NRAS-mutant melanoma patients.

### Materially False and Misleading Statements Issued During the Class Period

23.     The Class Period begins on December 16, 2015, when Array issued a press release, also attached as Exhibit 99.1 to the Form 8-K filed with the SEC, announcing the results of the Phase 3 NEMO trial (the "December 2015 Press Release").  In the press release, the Company stated, in relevant part:

**Array BioPharma Announces Phase 3 Binimetinib Trial Meets Primary Endpoint For NRAS-Mutant Melanoma**

-- Binimetinib achieves statistically significant progression free survival compared to chemotherapy –

-- Regulatory submissions planned for the first half of 2016 –

BOULDER, Colo., Dec. 16, 2015 /PRNewswire/ -- Array BioPharma (Nasdaq: ARRY) today reported top-line results from the ongoing Phase 3 clinical trial of binimetinib in patients with advanced NRAS-mutant melanoma, known as the

7

NEMO trial. *The study met its primary endpoint of improving progression-free survival (PFS) compared with dacarbazine treatment.* The median PFS on the binimetinib arm was 2.8 months versus 1.5 months on the dacarbazine arm; hazard ratio (HR) 0.62, [95% CI 0.47-0.80], p < 0.001.

In the trial, binimetinib was generally well-tolerated and the adverse events reported were consistent with previous results in NRAS melanoma patients.

Array plans to submit binimetinib to regulatory authorities for marketing approval in NRAS-mutant melanoma during the first half of 2016. Results from the NEMO trial including progression free survival, overall survival, objective response rate, safety and prespecified subgroup analyses including outcomes in patients who received prior treatment with immunotherapy will be presented at a medical meeting in 2016.

*"We are excited to announce positive results from the NEMO trial, which suggest binimetinib has the potential to provide an important new treatment option for patients with advanced NRAS melanoma," said Ron Squarer, Chief Executive Officer, Array BioPharma.* "We look forward to discussing the data with the FDA and other regulatory agencies in the near future."

"The presence of an NRAS mutation is a poor prognostic indicator for patients with advanced melanoma," said Keith T. Flaherty, M.D., Associate Professor, Medicine, Harvard Medical School and Director of Developmental Therapeutics, Cancer Center, Massachusetts General Hospital. *"I am encouraged the NEMO trial met its primary endpoint and look forward to sharing the full results soon.* As the first targeted therapy with positive results in NRAS melanoma, binimetinib will be a welcome addition in this high unmet need population, especially for patients whose disease has progressed following treatment with immunotherapy."

Binimetinib is also being studied in the Phase 3 COLUMBUS trial for patients with BRAF-mutant melanoma and the Phase 3 MILO trial for patients with low grade serous ovarian cancer, as well as in several other earlier stage clinical trials.

24. On May 3, 2016, Array issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the Company's financial and operating results for the third fiscal quarter and six months ended March 31, 2016 ("Q3 2016 Press Release"). The Q3 2016 Press Release stated in relevant part:

BOULDER, Colo., May 3, 2016 /PRNewswire/ -- Array BioPharma Inc. (NASDAQ: ARRY), a biopharmaceutical company focused on the discovery, development and commercialization of targeted small molecule cancer therapies, today reported results for its fiscal year third quarter ending March 31, 2016 and provided an update on the progress of its key clinical development programs.

*"We have a number of near-term value-drivers, highlighted by our planned NDA submission for binimetinib based on results from our Phase 3 trial in NRASmutant melanoma patients (NEMO),"* said Ron Squarer, Array's Chief Executive Officer. "At ASCO, we will present full results from the NEMO trial, as well as provide an update on our Phase 2 study of encorafenib plus cetuximab in BRAFmutant colorectal cancer patients. Later this summer, we plan to share top-line results from COLUMBUS, our Phase 3 trial of binimetinib and encorafenib in BRAF melanoma patients. We also expect results from SELECT-1, a study of selumetinib in second line KRAS-mutant non-small cell lung cancer patients. Given our estimated cash runway, a series of strong partnerships and continued Novartis funding of ongoing binimetinib and encorafenib trials, we are well positioned to execute on our long-term strategy."

KEY PIPELINE UPDATES

***Binimetinib (MEK162) and encorafenib (LGX818) Novartis Agreement*** Novartis continues to conduct and/or substantially fund all ongoing trials with binimetinib and encorafenib through their completion, including the NEMO and COLUMBUS trials. Reimbursement revenue from Novartis was approximately $74 million for the previous 9 months, of which $64 million was recorded over the past two quarters.

***NEMO: Global Phase 3 trial of binimetinib versus dacarbazine in NRASmutant melanoma patients***

Based on the results of the NEMO trial, Array plans to submit an NDA during the first half of 2016. Results from NEMO will be presented at the 2016 American Society of Clinical Oncology conference (ASCO), and will include progression free survival (PFS), overall survival (OS), objective response rate (ORR), safety and pre-specified sub-group analyses, including outcomes in patients who received prior treatment with immunotherapy.

(Emphasis added.)

25.     During the Q&A session of the conference call to discuss the Company's financial and operating results for the third fiscal quarter ended March 31, 2016 ("Q3 2016 Conference Call"), Array's executives made the following statements in response to Cantor Fitzgerald analyst Mara Goldstein's questions about the results of the Columbus trial, stating in relevant part:

**Mara Goldstein**

Thanks very much. Can you just maybe clarify something for me? On the NDA filing for binimetinib for NRAS melanoma, once you have completed the COLUMBUS trial and would have plans to submit that, does that become a redundant to the NDA or is that a supplemental? And can you just speak for the timing?

**Ron Squarer**

Sure. Mara, I think best answered by Dr. Sandor.

**Victor Sandor**

Yes. ***So the way that would normally work is that it would be supplemental NDA or COLUMBUS would represent a supplemental NDA for the binimetinib label and it would be a new NDA for encorafenib.*** Remember, it's a combination so it's essentially it is two separate NDA. One would be a labeling update hopefully and other one would be a new approval.

(Emphasis added.)

26.     With respect to the NRAS melanoma market and the commercial development of NEMO, Array's executives responded to analyst Ted Tenthoff from Piper Jaffray in relevant part:

**Ted Tenthoff**

And if I may just recall because I do think there is really important if you don't mind, so back to competing with Novartis and Roche, ***how are you going to really field the sales force and target the sales force to get your component of that 850- ish plus the NRAS melanoma market?***

**Ron Squarer**

Just a point out here, Roche was just recently approved and I think Andy's forecast for the year of $850 million is sort of a flat line no growth forecast. So he could generalize how we reach the market exceed a billion and I think the total addressable market is probably close to $2 billion although it is unlikely that the entire market will be penetrated.

**Andy Robbins**

So, Ted it is a great question. I think that the first answer to question is assuming NEMO is approved by the FDA we will have an advantage to launch our sales force to the exact same call point and channel in indication where we won't have direct compensation. ***None of the other MEKs will have an indication in NRAS melanoma. So that is the first differentiator that we will go out and market that***

*Binimetinib, it's a little bit special it is the only MEK that has demonstrated this effect in this disease. And then secondly and probably most importantly as you know oncologists and the prescribers are going to be influenced mainly by clinical data. And our drugs really differentiated and is there reason really to use them.* And for us that's where we come back to our tolerability advantage. For patients who are expected to take MEK and RAF in the BRAF melanoma setting for a median about a year, the side effects like pyrexia and photosensitivity that Ron walk through are not safety challenges. They are not going to lead to necessarily hospitalization or very significant safety challenges. But they are tolerability issues. And so when you are taking a drug for a year, to have a favorable 102, every couple weeks for three or four days or to have blisters when you are driving your car around and you are out in the sun, if there is another set of agents that has similar or potentially better efficacy and it does not have the side effects that's where we are going to spend our marketing muscle messaging and positioning our products.

**Ron Squarer**

Perhaps I'll just add one other thing. This point our position is that we expect to have similar activity in terms of duration of effect. We are the only MEK RAF combination in which we are able to dose the RAF inhibitor above its single agent MTD so we are offering higher levels of the RAF in relatively to the competition. But we have no evidence yet of some differentiated activity that would certainly be a very, very powerful outcome although we mentioned today on the call today in MEK RAF phase 3 readout the data has matured over time so it will be seen dynamic to decide when to call our activity profile but that would be the ideal. And then the only thing I will remind everyone is that while several hundred million dollars in revenue may not be as meaningful to in Novartis or Roche, *given our current valuation it would be highly transformative and would come after we essentially established our commercial effort on NRAS melanoma so it could be a really important value driver. So not to diminish the opportunity but even modest sales could be very important to us let alone taking significant share of this very large market*. Thanks for these questions, Ted.

(Emphasis added.)

27.     On June 30, 2016, Array issued a press release, also attached as exhibit 99.1 to the

Form 8-K filed with the SEC announcing that the filing of a New Drug Application ("NDA") for

binimetinib in patients with advanced NRAS-mutant melanoma to the U.S. Food and Drug

Administration ("FDA") ("June 2016 Press Release"). The Company made material

misrepresentations in the press release, including in pertinent part:

**Array BioPharma Submits Binimetinib New Drug Application to U.S. FDA**

First-ever NDA filing for Array

BOULDER, Colo., June 30, 2016 /PRNewswire/ -- Array BioPharma (Nasdaq: ARRY) today announced the submission of a New Drug Application (NDA) for binimetinib in patients with advanced NRAS-mutant melanoma to the U.S. Food and Drug Administration (FDA). *The submission is based on results of the pivotal Phase 3 NEMO (NRAS MELANOMA AND MEK INHBITOR) study, which found binimetinib significantly extended median progression-free survival (PFS), the study's primary endpoint, as compared with dacarbazine.*

*"The new drug application for binimetinib represents Array's first – an important milestone for this promising compound and our Company,"* said Ron Squarer, Chief Executive Officer, Array BioPharma. "NRAS-mutant melanoma represents an often overlooked subset of advanced disease without meaningful treatment options beyond immunotherapy and NEMO is the first-ever trial to meet a PFS endpoint in this population. We look forward to working with the FDA as they evaluate our application and the potential for binimetinib as a treatment option for these patients."

*In the NEMO study, binimetinib significantly extended median PFS at 2.8 months, as compared with 1.5 months observed with dacarbazine [hazard ratio (HR)=0.62 (95% CI 0.47-0.80), p<0.001] in patients with advanced NRAS-mutant melanoma.* In the pre-specified subset of patients who received prior treatment with immunotherapy, including ipilimumab, nivolumab or pembrolizumab, patients who received binimetinib experienced 5.5 months of median PFS (95% CI, 2.8–7.6), compared with 1.6 months for those receiving treatment with dacarbazine (95% CI, 1.5–2.8).

28.     On September 1, 2016, Array issued a press release, also attached as exhibit 99.1

to the Form 8-K filed with the SEC announcing that the FDA accepted the NDA for binimetinib

in patients with advanced NRAS-mutant melanoma ("September 1, 2016 Press Release"). The

Company stated in pertinent part:

### Array BioPharma Announces FDA Acceptance of Binimetinib NDA for Patients with Advanced NRAS-Mutant Melanoma

BOULDER, Colo., Sept. 1, 2016 /PRNewswire/ -- Array BioPharma (Nasdaq: ARRY) today announced that the FDA has accepted its New Drug Application (NDA) for binimetinib with a target action date under the Prescription Drug User Fee Act (PDUFA) of June 30, 2017. Array completed its NDA submission of binimetinib in late June 2016 based on findings from the pivotal Phase 3 NEMO (NRAS MELANOMA AND MEK INHIBITOR) trial in patients with NRASmutant melanoma. The FDA also indicated that it plans to hold an advisory committee meeting (ODAC) as part of the review process. As previously

reported, Array is currently preparing for an Application Orientation Meeting (AOM) with the FDA in September 2016, which it expects will include a discussion of the NDA package including clinical risk / benefit.

"There are very few treatment advances beyond immunotherapy for this devastating disease, which impacts one out of five advanced melanoma patients," said Victor Sandor, M.D., Chief Medical Officer, Array BioPharma. ***"Binimetinib is the first and only MEK inhibitor to demonstrate improvement on progression free survival in a Phase 3 trial for NRAS mutant melanoma patients."***

29.     On September 26, 2016, Array issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing the results of another Phase 3 study of Binimetinib (COLOMBUS), this time for BRAF-Mutant Melanoma ("September 26, 2016 Press Release"). Throughout the September 26, 2016 Press Release, the Company used the opportunity to reapprove the previous statements about the NDA for binimetinib in patients with advanced NRAS-mutant melanoma, stating in pertinent part:

**Array BioPharma and Pierre Fabre Announce COLOMBUS Phase 3 Study of Encorafenib plus Binimetinib For BRAF-Mutant Melanoma Met Primary Endpoint**

- Demonstrated statistically significant results with median PFS on combination of encorafenib plus binimetinib 14.9 months versus 7.3 months on vemurafenib –

- Generally well-tolerated and safety profile overall consistent with prior encorafenib plus binimetinib clinical trial results –

- Global regulatory submissions planned for 2017 –

BOULDER, Colo., Sept. 26, 2016 /PRNewswire/ -- Array BioPharma (Nasdaq: ARRY) and Pierre Fabre today jointly announced top-line results from Part 1 of the Phase 3 COLOMBUS (Combined LGX818 Used with MEK162 in BRAF Mutant Unresectable Skin Cancer) study evaluating LGX818 (encorafenib), a BRAF inhibitor, and MEK162 (binimetinib), a MEK inhibitor, in patients with BRAF-mutant advanced, unresectable or metastatic melanoma. The study met its primary endpoint, significantly improving progression free survival (PFS) compared with vemurafenib, a BRAF inhibitor, alone.

* * *

**About Binimetinib & Encorafenib**

MEK and BRAF are key protein kinases in the MAPK signaling pathway (RASRAF-MEK-ERK). Research has shown this pathway regulates several key cellular activities including proliferation, differentiation, survival and angiogenesis. Inappropriate activation of proteins in this pathway has been shown to occur in many cancers, such as melanoma, colorectal and thyroid cancers. Binimetinib is a late-stage small molecule MEK inhibitor and encorafenib is a late-stage small molecule BRAF inhibitor, both of which target key enzymes in this pathway.

Binimetinib and encorafenib are being studied in clinical trials in advanced cancer patients, including the recently initiated Phase 3 BEACON CRC trial that will study encorafenib in combination with cetuximab with or without binimetinib in patients with BRAF V600E-mutant colorectal cancer. Array submitted a New Drug Application (NDA) for binimetinib in NRAS-mutant melanoma to the FDA at the end of June 2016. The FDA accepted the NDA with a target action date under the Prescription Drug User Fee Act (PDUFA) of June 30, 2017.

Array BioPharma retains exclusive rights to binimetinib and encorafenib in key markets including the U.S. and Japan.

(Emphasis added.)

30.     On this news, the Company's common share price rose over 80% from a close of $3.66 on September 23, 2016 to a close of $6.61 per share on September 26, 2016.

31.     The following day, on September 27, 2016, Array issued a press release announcing a proposed public offering of $100 million of shares of its common stock.

32.     On September 28, 2016, Array filed a Prospectus Supplement on Form 424B5 with the SEC announcing the pricing of the above-mentioned public offering of 18,400,000 shares of its common stock at a public offering price of $6.25 per share ("Prospectus Supplement"). The Prospectus Supplement stated in relevant part:

**NEMO**

NEMO is a Phase 3 study comparing binimetinib versus dacarbazine in unresectable or metastatic NRAS-mutant melanoma patients. On September 1, 2016, Array announced that the FDA had accepted Array's New Drug Application, or NDA, for binimetinib in patients with advanced NRAS-mutant melanoma with a target action date under the Prescription Drug User Fee Act (PDUFA) of June 30, 2017. The FDA also indicated that it plans to hold an

Oncologic Drugs Advisory Committee (ODAC) meeting as part of the regulatory process.

Activating NRAS mutations are present in approximately 20% of patients with metastatic melanoma, and have been a poor prognostic indicator for these patients. Treatment options for this population remain limited beyond immunotherapy (PD- 1, CTLA4). Therefore, if approved, binimetinib could represent an important additional therapy for these patients.

***The NDA submission is based on results of the NEMO study, which found binimetinib extended median PFS, the study's primary endpoint, as compared with dacarbazine. In the NEMO study, binimetinib extended median PFS at 2.8 months, as compared with 1.5 months observed with dacarbazine [hazard ratio (HR)=0.62 (95% CI, 0.47-0.80), p<0.001] in patients with advanced NRAS-mutant melanoma.  In the pre-specified subset of patients who received prior treatment with immunotherapy (n=85), including ipilimumab (n=54), and nivolumab or pembrolizumab (n=24), patients who received binimetinib experienced 5.5 months of median PFS (95% CI, 2.8-7.6), compared with 1.6 months for those receiving treatment with dacarbazine (95% CI, 1.5-2.8).*** While the results in the pre-specified sub-group of patients who had received prior treatment with immunotherapy are of interest, interpretation beyond overall consistency with the primary result should be made with care. ***Array anticipates that the primary consideration for marketing approval will be the results for the primary endpoint of the trial.***

In addition to improving PFS, binimetinib also demonstrated significant improvement in the secondary endpoints of ORR and disease control rate, or DCR. While there was no statistically significant difference demonstrated in overall survival, the numerical trend in median overall survival, or mOS, favored the binimetinib arm.

(Emphasis added.)

33.   On October 3, 2016, Array announced the closing of its underwritten public offering of 21,160,000 shares of its common stock, which included 2,760,000 shares of common stock issued upon the exercise in full of the option to purchase additional shares granted to the underwriters, at a public offering price of $6.25 per share. The total gross proceeds from the offering were $132.25 million, before underwriting discounts and commissions and offering expenses.

34.     The statements referenced in ¶¶ 23-33 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Array's NEMO study failed to show sufficient clinical benefit of the binimetinib NDA in use for patients with NRAS-mutant melanoma; (ii) the Company was aware that this lack of supporting clinical data would not be sufficient to received FDA approval of binimetinib in use for patients with NRAS-mutant melanoma; and (iii) as a result of the foregoing, Array's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

35.     On Sunday, March 19, 2017, Array issued a press release announcing the withdrawal of the binimetinib NDA in use for patients with NRAS-mutant melanoma ("March 2017 Press Release"), stating in relevant part:

> BOULDER, Colo., March 19, 2017 /PRNewswire/ -- Array BioPharma Inc. (ARRY) *today announced that it has withdrawn from the U.S. Food and Drug Administration's (FDA) Division of Oncology Products 2 its new drug application (NDA) for binimetinib monotherapy for the treatment of NRASmutant melanoma, a rare, mutationally-driven subset of skin cancer.*
>
> This action was based on thorough discussions and communications with the FDA, including exploration of various paths to approval, and followed the late cycle review meeting held with the FDA on Friday, March 17, 2017. Based on feedback from the agency, Array concluded that the clinical benefit demonstrated in the Phase 3 NEMO clinical trial would not be found sufficient to support approval of the NRAS-mutant melanoma NDA.
>
> Ongoing clinical trials for binimetinib will continue. This action will not impact the planned Phase 3 COLUMBUS trial NDA of binimetinib, in combination with encorafenib, for the treatment of BRAF-mutant melanoma, which remains on track for mid-2017.

(Emphasis added.)

16

36.     On March 20, 2017, before the market opened, biotech analyst John Carroll from Endpoints News published an article entitled "Array walks back its FDA pitch on binimetinib, derailing plans for commercial launch." The article was updated the following day, stated in relevant part:

> **Array BioPharma has some explaining to do. Fifteen months after the Boulder, CO-based biotech said that it had the data needed for its first approval of binimetinib for NRAS-positive melanoma, execs are walking back the application and its plans for a launch.**
>
> In a statement out Sunday evening, Array $ARRY said that after getting feedback from the FDA, execs "concluded that the clinical benefit demonstrated in the Phase 3 NEMO clinical trial would not be found sufficient to support approval of the NRAS-mutant melanoma NDA."
>
> Shares of Array dropped 26% in pre-market trading Monday.
>
> Michael Schmidt at Leerink was not pleased. He noted:
>
>> While NRAS+ melanoma was only a small value driver for the company, *we think this comes as a surprise to investors and is a clear setback for the company and mgmt.'s regulatory and commercial strategy. Recall, management planned to build a commercial infrastructure and visibility with customers this year around the launch in NRAS+ melanoma, which would also be in preparation for the planned launch in 2018 of binimetinib/encorafenib in more competitive BRAF+ melanoma, which is ARRY's main value driver.*
>
> **It was a much different story back in late 2015 when CEO Ron Squarer said that their MEK blocker hit the primary endpoint on progression-free survival, with the drug arm registering 2.8 months compared to 1.5 months for a group on dacarbazine. It didn't look like much, but Array said it was plenty to take to the FDA.**
>
> In the summer of 2016, though, the biotech also conceded that the drug had not significantly improved overall survival.
>
> Array has had plenty of ups and downs with the drug. Novartis had partnered with the company, but punted the program when they executed a big asset swap with GlaxoSmithKline. Pierre Fabry then took their spot, but Array held on to US commercial rights.

(Emphasis added.)

17

37.     On this news, Array's share price fell $1.43 or 13.54% over two trading days, to close at $9.13 on March 21, 2017.

38.     On May 10, 2017, during a conference call to discuss the Company's financial and operating results for the third fiscal quarter ended March 31, 2017 ("Q3 2017 Conference Call"), analyst Michael Schmidt from Leerink asked about the reasons of the withdrawal of the binimetinib NDA in use for patients with NRAS-mutant melanoma. Ultimately, while attempting to blur the truth, Array's CEO and Individual Defendant Squarer admitted that: (i) Array lacked sufficient data to support approval of the binimetinib NDA in use for patients with NRAS-mutant melanoma, (ii) as a result, Array was aware it would not be able to launch binimetinib in use for patients with NRAS-mutant melanoma. In relevant part:

**Michael Schmidt**

*And then I guess just a question going back to NRAS melanoma, just curious to the reasons why you put the NDA ahead of the outcome actually?*

**Ron Squarer**

Yes Michael, it's Ron. I think did what we could to explain the situation. We know that history, we feel we've always been transparent with the present cons of the data published and shared them and give and we always gave, we considered to be the appropriate attention meaning we never suggested that it was slam dunk and didn't also suggest it was key to our evaluation, it was a very small population which would have yielded very low revenues. The reason we did what we did which was everything that could be done to pursue potential approval over a long period of time, an extensive conversation with the FDA was in an attempt to make the product available to patients who have really so few choices, so after you progress in NRAS melanoma, therapy, you really have no reasonable choice available. *And so we believe that working with the FDA we would find a way but when it became clear that was not going to occur, we made the decision that we made and clearly we and they need to be focused now regarding the Array portfolio on Columbus and then later BECON.*

**Michael Schmidt**

*But was it basically a function of the changing treatment paradigm in the context of those patients or was it related to the data itself?*

**Ron Squarer**

***Those two are tightly linked***, and so clearly the majority of our patients were in first line and in NRAS specifically IO is a clear first line therapy. And so then you're sure that is a component of the calculation. ***Without months of deliberation and creative work to find a path forward, it's impossible to sort of explain it is leading to one thing.*** The FDA has a job to do and they consider a lot of factors in doing it and the best we can do is present our best case and we feel we did that and that's all the insight I have on it.

(Emphasis added.)

39.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

40.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Array securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

41.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Array securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Array or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Array;

- whether the Individual Defendants caused Array to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Array securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

46.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Array  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Array securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

47.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

48.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

49.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

51.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Array securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Array securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

52.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Array securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Array's finances and business prospects.

53. By virtue of their positions at Array , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

54. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Array, the Individual Defendants had knowledge of the details of Array's internal affairs.

55. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Array. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Array's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price

of Array securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Array's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Array securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

56.     During the Class Period, Array securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Array securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Array securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Array securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

57.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

59.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

60.    During the Class Period, the Individual Defendants participated in the operation and management of Array, and conducted and participated, directly and indirectly, in the conduct of Array's business affairs.  Because of their senior positions, they knew the adverse non-public information about Array's misstatement of income and expenses and false financial statements.

61.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Array's financial condition and results of operations, and to correct promptly any public statements issued by Array which had become materially false or misleading.

62.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Array disseminated in the marketplace during the Class Period concerning Array's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Array to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Array within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Array securities.

63.     Each of the Individual Defendants, therefore, acted as a controlling person of Array.  By reason of their senior management positions and/or being directors of Array, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Array to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Array and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

64.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Array.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: November 28, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*

Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang (not admitted)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
         ahood@pomlaw.com
         hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein (not admitted)
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
peretz@bgandg.com

*Attorneys for Plaintiff*